The STATE ex rel. BABIONE

v.

MARTIN et al.

[Cite as *State ex rel. Babione v. Martin* (1994), 97 Ohio App.3d 539.]

Court of Appeals of Ohio,
Lucas County.

No. L–93–260.

Decided July 15, 1994.

*John F. Wetli* and *Tybo Alan Wilhelms,* for relator.

*David J. Rohrbacher* and *Nicholas J. Cron,* for respondents.

---

ABOOD, Presiding Judge.

This is an original action in quo warranto filed by relator, Donald E. Babione, to remove respondents, Raymond J. Martin and others,[1] from their positions as members of the Board of Directors and officers of Martin Bros. Container & Timber Products Corp.

The relevant evidence was submitted to this court by the stipulations of the parties and the depositions of Cecelia Austin, Donald Babione, Rita Babione, Loretta Gardner, Veronica Hackett Hanford, Aura Karle, James Martin, Ray Martin, and Therese Schweickert.

The undisputed facts established by the evidence are as follows. Martin Bros. Container & Timber Corp. is a family-owned corporation in which all of the voting shares are held by members of the Martin family. On June 7, 1993, Martin Bros. had its annual shareholders' meeting, during which it held an election to determine membership of the board of directors. A timely request for cumulative voting was received and two different slates of candidates were proposed. The president, Jim Martin, nominated Cecelia Austin, Loretta Gardner, Ray Martin, and Jim Martin ("the Martin slate"). Don Babione, the spouse of one of the Martin siblings and a co-trustee of 838.934 shares of voting stock, nominated Don Babione, Brent Martin, Therese Schweickert, and Aura Karle ("the Babione slate").

Prior to the election's taking place, a dispute arose involving the voting of some of the shares. Ray Martin distributed a copy of an agreement that had been

---

1. James J. Martin, Cecelia A. Austin, Loretta M. Gardner, Veronica A. Hanford, Donald Babione as trustee, Rita Babione, individually and as trustee, Brent Martin, Therese R. Schweickert, Aura A. Karle, Benedict L. Martin, Catherine M. Clark, Mary E. Martin as trustee, and Frederick J. Martin V. All of the respondents are siblings, their spouses, or children.

signed by eight of the Martin siblings in 1976 in which they had agreed to "stick together until we get control of the company."[2]

Ray Martin ruled that he, as the chair of the meeting, would recognize the agreement as binding and would receive the votes from those shares as a block from a representative of the "pool." Three of the eight signatories of the agreement protested this action. Thereafter, the cumulative total of the shares of those eight signatories was voted in a block by Jim Martin as the group's representative with the votes equally divided among the members of the Martin slate. Proxy holders for Catherine Clark, Ben Martin, and the D.J. Martin Trust cast their votes for the members of the Babione slate. At that time, Don Babione, Rita Babione, and Therese Schweickert announced that they intended to vote their shares divided equally among the members of the Babione slate. In response, the corporate secretary, Thomas Yarnell, stated that it was his understanding that those shares had already been voted by Jim Martin as part of the "pool." As a result, those who had signed the 1976 agreement were denied the right to vote the shares of stock for which they are the shareholders of record.

The vote as recorded with the pooling agreement in place and the vote that the shareholders would have made if the pooling agreement had not been recognized is set forth in the following chart:

| SHAREHOLDER | CUMULA-TIVE SHARES | WITH 1976 AGREEMENT | | WITHOUT 1976 AGREEMENT | |
| --- | --- | --- | --- | --- | --- |
| | | MARTIN SLATE | BABIONE SLATE | MARTIN SLATE | BABIONE SLATE |
| Ray Martin | 14,832.538 | 14,832.538 | | 14,832.538 | |
| Jim Martin | 5,872.538 | 5,872.538 | | 5,872.538 | |
| C. Austin | 5,872.538 | 5,872.538 | | 5,872.538 | |
| L. Gardner | 5,872.538 | 5,872.538 | | 5,872.538 | |
| V. Hanford | 5,872.538 | 5,872.538 | | 5,872.538 | |
| Babione Trust | 5,872.538 | 5,872.538 | | | 5,872.538 |
| R. Babione | 1,468.1345 | 1,468.1345 | | | 1,468.1345 |
| T. Schweickert | 1,468.1345 | 1,468.1345 | | | 1,468.1345 |
| Schweickert Trust | 5,872.538 | 5,872.538 | | | 5,872.538 |
| Ben. Martin | 7,340.6725 | | 7,340.6725 | | 7,340.6725 |
| C. Clark | 7,340.6725 | | 7,340.6725 | | 7,340.6725 |
| Fred Martin | 3,528. | | | 3,528. | |
| Don Martin Trust | 14,832.538 | 14,832.538 | | 14,832.538 | |
| Totals | 86,045.918 | 56,532.035 | 29,513.883 | 41,850.69 | 44,195.228 |

Upon recording the vote, the secretary announced that Cecelia Austin, Loretta Gardner, Ray Martin, and Jim Martin were elected to the board, but that there

---

2. The agreement had been signed by the siblings in 1976 in anticipation of receiving stock that had been held in trust for them. When they received their shares, the shares were registered in their individual names.

was a tie among the four others. The chair, Ray Martin, then offered the option of either having another vote or deciding among themselves to have Therese Schweickert, Don Babione, and Brent Martin fill the remaining three positions. Counsel for Don Babione then stated that, according to his calculations, the tie vote was among the first slate. The chair stated that that was not the case and, after consultation with counsel, announced that there would be an election to determine which three of the four would be elected to fill the remaining seats. As ordered by the chair, the secretary polled the proxies for Catherine Clark, Ben Martin, and D.J. Martin Trust as to how or whether they wanted to change their votes. All stated that they objected to the voting, since they had already cast their votes. There being no change, the chair opened the vote to fill the three remaining positions to those eligible to vote, meaning the "pool," and the proxies for C. Clark, B. Martin, and D.J. Martin Trust. This election resulted in the "pool," plus Fred Martin, voting their eligible shares for Aura Karle, Therese Schweickert, and Don Babione. Upon being polled, each of the proxy holders objected to the procedure and declined to vote.

Brent Martin then queried the chair if the "pool" side would be willing to vote to break what his side considered a tie. The chair answered "no" and stated that this territory had already been covered. The secretary then announced that the three remaining seats on the board were filled by Don Babione, Therese Schweickert, and Aura Karle. The shareholders' meeting was then adjourned.

The board of directors' meeting was held immediately after the shareholders' meeting. During this meeting, the election of corporate officers was held. Jim Martin proposed the following slate:

Ray Martin—Chairman of the Board and Vice President

Jim Martin—President

Loretta Gardner—Vice President

Thomas Yarnell—Secretary–Treasurer

Don Babione placed in nomination the following:

Brent Martin—Chairman of the Board

Don Babione—President

Ben Martin—Vice President

Thomas Yarnell—Secretary–Treasurer

Ray Martin stated that Brent Martin could not be chairman of the board, since he was not a member of the board. Don Babione stated that he made the nomination and it should stand. Upon roll call by the secretary, the following votes were cast: Cecelia Austin, Loretta Gardner, Ray Martin, and James Martin

cast their votes for the slate proposed by Jim Martin. Don Babione, Therese Schweickert, and Aura Karle objected to Cecelia Austin's being on the board and cast their votes for the slate nominated by Don Babione. Brent Martin then stated that he objected to all board members except for Don Babione, Aura Karle, and Therese Schweickert, and cast a vote for the Babione slate, which included himself. The chair stated that Brent Martin had no vote to cast, and that his vote was only a matter of record. The slate of Ray Martin, Jim Martin, Loretta Gardner, and Thomas Yarnell was announced elected. Don Babione objected to the vote as stated.

On both June 10, 1993 and June 14, 1993, Don Babione presented himself at the offices of the corporation and demanded possession of the office of the president and the company's books and records. Both times he was refused possession of the office and records by Jim Martin.

On September 7, 1993, Don Babione, as relator, filed his complaint in quo warranto, in which he alleged that he was wrongfully and unlawfully denied his seat as a director of the corporation and the office of president of the corporation.

In support of his complaint, relator argues that at both the election of directors and the election of officers, illegal votes were received and legal votes were rejected that were sufficient to change the results. He argues that the election is invalid because the corporation did not allow several of the shareholders of record to vote their shares and instead allowed a purported pooling agreement to control the votes.

Relator requests that the respondents be required to show by what legal warrant they hold office in the corporation and that this court issue a writ of quo warranto to oust those illegally holding or exercising any such offices and give possession of their respective positions to the duly elected officers and directors of the corporation.

On November 3, 1993, respondents filed their answer to relator's complaint in quo warranto in which they respond that (1) there were no illegal votes received and no legal votes rejected that are sufficient to change the results of the election of either directors or officers; (2) there was not an unlawful attempt to alter the election in their favor; and (3) quo warranto is not the proper proceeding in this situation and therefore this court does not have jurisdiction over this matter.

I

This court will first address the issue of whether quo warranto is the proper action in this case. A civil action in quo warranto may be brought in the name of the state against a person who usurps, intrudes into, or unlawfully holds

or exercises an office in a corporation created by the authority of this state.  R.C. 2733.01.

The respondents argue that the interpretation of the 1976 agreement must be resolved before the validity of the disputed elections can be addressed and that such interpretation is properly the subject of a declaratory judgment action in the court of common pleas.  In their argument, respondents rely on *State ex rel. Tubbs Jones v. Brown* (1991), 76 Ohio App.3d 154, 158, 601 N.E.2d 163, 165, in which the court denied quo warranto relief where two of a corporation's three shareholders were challenging the third shareholder's right to increase the size of the board of directors.  The court in that case ruled that the primary issue before them was the interpretation of an agreement between the three shareholders.  In considering that issue, that court discussed *Ilerio v. Spanish–American Commt. for a Better Community* (Nov. 8, 1979), Cuyahoga App No. 39606, unreported, where the court ruled that, while the incidental effect of the plaintiff's complaint was to bring into issue the election of trustees resulting from the expansion of the board due to the amended corporate regulations, the complaint's "primary thrust is to test the legality of an official action taken, *i.e.,* the adoption of amendments to the corporate regulations without the approval of the members."  The *Tubbs Jones* court found that when the primary issue centers on the interpretation of the shareholders' agreement, quo warranto is not the proper remedy.  *State ex rel. Tubbs Jones v. Brown* (1991), 76 Ohio App.3d 154, 158, 601 N.E.2d 163, 165.

*Tubbs Jones* and *Ilerio* can be distinguished from the case before this court. Each of the above cases involves the legality of an action taken to add seats to the board of directors of a corporation.  The conduct challenged in these cases is the increase in the size of the board, not who specifically sits on the board as the result of a disputed election.  In *Tubbs Jones,* the court distinguished *Capri v. Johnson* (1972), 32 Ohio App.2d 95, 61 O.O.2d 93, 288 N.E.2d 604, a case in which the issue was the same as the issue in this case, which is whether the individuals acting as directors were properly elected.

In *Capri,* the Franklin County Court of Appeals found that where the validity of a corporate election is the core issue, "quo warranto is the only remedy to challenge the title of a de facto officer of a private corporation, and the right to a corporate office cannot be tested by mandamus or by injunction or other equitable proceeding."  *Id.,* 32 Ohio App.2d at 98, 61 O.O.2d at 95, 288 N.E.2d at 606.  See, also, *Hendershot v. Conner* (1974), 48 Ohio App.2d 335, 337, 2 O.O.3d 314, 315, 357 N.E.2d 386, 387 (quo warranto is the proper proceeding where the core of the relief sought is to set aside an election).

R.C. 2733.15 provides:

"When an action in quo warranto is against a director of a corporation, and the court finds that, at his election, illegal votes were received or legal votes rejected sufficient to change the result, judgment may be rendered that the defendant be ousted, and of induction in favor of the person who was entitled to be declared elected."

This is precisely the relief that is sought by relator.

Upon consideration of the pleadings, the record herein and the law, this court finds that quo warranto is the proper action in this case and this court does have jurisdiction in these proceedings.

## II

This court will next address the issue of the validity and meaning of the 1976 agreement. The relator argues that, even if the agreement is still valid in 1993, the agreement is unrelated to the issue of who is entitled to vote the shares; the agreement is not a legally binding voting agreement; and, even if it is a pooling agreement, the shareholders should have been allowed to vote their own shares. The respondents argue that the agreement was intended to bind the group together to both gain and maintain control of the corporation.

The voting and beneficial rights of stock may be separated from each other by a valid voting trust. To have a voting trust one must comply with R.C. 1701.49(A), which states:

"By written agreement certificates for shares of a corporation may be deposited within or without this state by any holder or holders thereof with one or more persons as trustees, or with any depositary designated by or pursuant to such agreement to act for such trustees, for the purpose and with the effect of granting to such trustees or a majority of them, or to such persons as may be designated by or pursuant to such agreement, all the voting, consenting, or other rights in respect of the shares represented by such certificates, or such of these rights as may be specified in the agreement, or for such other lawful purposes as may be specified in the agreement, for such period and upon such terms as may be stated therein."

"No such agreement which grants the voting of consenting rights in respect of shares shall be irrevocable for a period of more than ten years, unless the voting or consenting rights granted thereby are coupled with an interest in the shares to which such rights relate, except that, if the agreement so provides, such irrevocable grant may be extended for additional periods of not more than ten years each,

upon the affirmative vote or assent of the beneficial owners of not less than a majority of the shares deposited under the agreement." R.C. 1701.49(B).

Upon review of the 1976 agreement, this court finds that the statutory requirements were clearly not met in several ways: (1) the agreement did not name a trustee; (2) certificates for shares were not deposited with a named trustee; and (3) there was never a re-registration of the shares either in the name of a trustee or on the books of the corporation. The shareholders of record continued to be each individual. Ray Martin, the drafter of the agreement, makes it clear in his letter of May 25, 1981 to the other signatories and their spouses that the agreement is not a voting trust. He stated, "I deal with Buy and Sell agreements and Voting Trust agreements once in a while and they are completely different than our agreement."

While the 1976 agreement does not meet the requirements of a voting trust agreement, it is possible to have a common-law agreement to pool shares. The voting trust statute, R.C. 1701.49(H), states that "the rights conferred by this section are in addition to rights at common law, and no limitation established by this section shall limit rights at common law."

The 1976 agreement is unclear and ambiguous as to what the parties actually agreed to do when they signed it other than to, at the time, "stick together until we get control of the company." When a term or terms are ambiguous, a contract must be construed. "In construing any written instrument, whether it be a will, contract, statute, or constitution, the primary and paramount rule is: What was the intent or purpose of the makers of such written instrument? And it is conceded to be the almost universal law that that intent of purpose shall be chiefly gathered from the language employed in such instrument." *State ex rel. Maher v. Baker* (1913), 88 Ohio St. 165, 172, 102 N.E. 732, 734. "A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 132, 31 OBR 289, 290, 509 N.E.2d 411, 413.

There is nothing in the 1976 agreement that specifically refers to or mentions voting rights or pool voting. It is therefore necessary to look to extrinsic evidence to determine the parties' intentions. Ray Martin, the drafter, in his letter of April 22, 1981 to the other signatories and their spouses states that "the agreement does not have anything to do with voting, and I * * * have continued to refuse to give anyone the right to control the future voting of my shares. I also do not and have not requested you to be bound on the voting of your shares."

Upon consideration of the evidence as summarized above and the law, this court finds that the 1976 agreement is not a common-law pooling agreement to control voting of the signatories' shares.

Although the relator also argues that the 1976 agreement was terminated in 1982 by an agreement of five of the eight signatories, because of our findings that the agreement, even if valid, would not control voting, we need not reach this issue.

In accordance with the foregoing, this court finds and it is hereby ordered that (1) the shareholders of record should have been allowed to vote their shares at the annual shareholders' meeting on June 7, 1993; (2) illegal votes were received and legal votes were rejected that were sufficient to change the result of the election; and (3) a quo warranto writ is hereby granted to oust Raymond J. Martin, James J. Martin, Cecelia A. Austin, and Loretta M. Gardner from the board of directors and to install Donald E. Babione, Brent D. Martin, Therese R. Schweickert, and Aura A. Karle as directors; and (4) a quo warranto writ is hereby granted to oust Raymond J. Martin as chairman of the board and vice-president, James J. Martin as president and Loretta M. Gardner as vice-president and to install Brent D. Martin as chairman of the board, Donald E. Babione as president, and Benedict L. Martin as vice-president.

Pursuant to R.C. 2733.14, relator is entitled to recover his costs in this action. This award of costs does not include attorney fees. *Sorin v. Warrensville Hts. School Dist. Bd. of Edn.* (1976), 46 Ohio St.2d 177, 179, 75 O.O.2d 224, 225, 347 N.E.2d 527, 528. Respondents are ordered to pay the court costs of this action.

*Writ granted.*

MELVIN L. RESNICK and SHERCK, JJ., concur.